W. E. HARDISTER, ADMINISTRATOR OF W. W. SANDERS,
v. R. P. RICHARDSON.

(Filed 19 May, 1915.)

**1. Master and Servant—Negligence—Evidence—Trials—Questions for Jury—Nonsuit.**

In an action to recover damages for the alleged negligent killing of plaintiff's intestate employed to work in the defendant's mine, there was evidence tending to show that up to ten days of the death of the intestate the defendant had used a "bucket" operated by steam power to haul up the ore and employees from a 250-foot shaft, using certain different signals before hauling up the ore and employees; and without change of rules, defendant put in an appliance known as a "skip," which ran upon iron rails, in place of the "bucket," without notifying the operator of the hoisting engine that the use of the "skip" was forbidden the employees; that the defendant and his foreman rode upon the "skip" under the same rules applying to the "bucket"; that the skip was derailed at a distance of 50 feet up the shaft, and threw the intestate down to his death, and that the customary signals had been exchanged with the "hoisterman" operating the engine that employees were on the "skip," and that the "skip" could have been rendered safe with a simple device. *Held*, sufficient upon the question of actionable negligence to be submitted to the jury, of the permissive use of the skip, and defendant's motion to nonsuit was properly refused.

**2. Master and Servant—Negligence—Dangerous Appliances—Invitation Implied.**

In an action for damages for the negligent killing of plaintiff's intestate, an employee in defendant's mine, in being thrown from a "skip" while riding on it to the surface of the ground, it is held that the defendant and his superintendent riding on the "skip" in the same manner was an implied invitation to the employees to do so, in the absence of evidence to the contrary.

**3. Trials—Evidence—Hearsay—Dangerous Appliances—Inhibited Use.**

Where plaintiff's intestate has been killed while being carried to the surface of the ground after working in defendant's mine as an employee, it is incompetent as hearsay for the defendant to show by another employee, a witness, what he had been told with regard to not using the device, when such is not for the purpose of impeachment.

**4. Master and Servant—Negligence—Dangerous Appliance—Res Ipsa Loquitur—Evidence—Instructions.**

Where an employee in a mine is killed while coming to the surface of the earth on an implement called a "skip" operated by power, and in the customary way, which could have been made safe by the use of a simple device; and the death was caused by the "skip" jumping the rail and throwing the intestate to the bottom of the shaft, it is *Held*, that the doctrine of *res ipsa loquitur*, with the other circumstances of the case, should be submitted to the jury upon the issue of defendant's actionable negligence. The charge in this case is approved.

APPEAL by defendant from *Adams, J.*, at December Term, 1914, of RANDOLPH.

Civil action, tried upon these issues:

1. Was the death of the plaintiff's intestate caused by the negligence of the defendant, as alleged in the complaint? Answer: "Yes."

2. Did said intestate, by his own negligence, contribute to the injury causing his death? Answer: "No."

3. What damages, if any, is plaintiff entitled to recover? Answer: "$2,500."

Defendant appealed.

*Hammer & Kelly for plaintiff.*
*J. A. Spence, J. M. Brown & Son for defendant.*

BROWN, J. There are three assignments of error: (1) overruling motion to nonsuit; (2) excluding evidence of witness Jeff Parish; (3) to an instruction of the court to the jury.

(1) The evidence, taken in its most favorable view for plaintiff, tends to prove that for some time prior to his death plaintiff's intestate was employed by defendant to work in a gold mine as an underground hand; that the shaft of the mine had been sunk to a depth of 250 feet; that when intestate began work a "bucket" was used by defendant for the purpose of drawing ore and employees out of the mine, and the defendant had adopted and posted written rules governing the use of this "bucket"; that these rules prescribed a certain number of rings of a bell as a signal to the "hoisterman" that the "bucket" was loaded with ore, and for a certain other number as a signal that men were on; that the "bucket" was drawn up by means of a cable which wound round a drum, which drum was caused to revolve by means of a steam engine, the operator of this engine being known as a "hoisterman"; that there was also a ladder running from the bottom of the shaft to the surface; that the employees of defendant habitually rode in this "bucket," using the signals prescribed in said printed rules with the knowledge and by the permission of defendant; that this bucket remained in use until about ten days before the death of the intestate, when it was displaced by a car known as a "skip," which ran upon iron rails; that the aforesaid rules were used to govern the use of the skip; that defendant and his foreman rode upon the skip, and used these same rules which were used for the bucket; that the operator of the hoisting engine was not notified that the rules governing the use of the skip were different from those which had been used for the bucket; he was never notified that there was a rule forbidding the use of the skip by employees.

The skip was a self-dumper, the bed not being fastened securely to the body thereof; that an inexpensive chain or hook would have made the "skip" perfectly safe; that on the day of intestate's death, intestate and two other members of his crew, one of them, Neill Class, being in charge of the crew, gave the prescribed signal indicating that there were men aboard; this signal was answered by the hoisterman, indicating that he understood same, and the skip was then put in motion, and after being

drawn up about 50 feet, was derailed and turned bottom upward, throwing intestate and his companions out and instantly killing them.

There is abundant evidence of contributory negligence, tending to prove that the intestate was personally forbidden by the foreman to ride on the skip. All this character of evidence was offered by the defendant, and doubtless properly submitted to the consideration of the jury under that issue. There is no assignment of error relating to the evidence or to the charge upon the second issue, and it is presumed, therefore, that defendant is content therewith.

We think there is evidence sufficient to be submitted to the jury of a permissive user of the skip.

It is admitted that the employees used the bucket constantly until it was displaced by the skip. When this was substituted, the defendant's plain duty was to notify his employees not to use it. By directing the hoisterman not to bring the workmen up on the skip, defendant could most effectually have prevented its use for such purpose. He knew the miners had been using the bucket, and he must have known they would use the skip. To a man worn out with a day's toil in a mine the temptation to use the skip rather than climb up 250 feet on a ladder is almost irresistible. Besides, the defendant and his foreman set the example and rode in the skip several times, using the same signals which had been used for the bucket, thereby adopting the same signals for the skip that had been in use for the bucket; this was an implied invitation to the employees to ride the skip. "Actions speak louder than words," and by this conduct defendant told his employees that the skip was safe for their use.

The testimony of several of the employees tends to prove that they and their associates knew nothing of the existence of a rule forbidding the use of the skip by them.

There is evidence tending to prove that a hook and chain fastened to the skip would have made the skip perfectly safe and prevented the derailment which caused the death of the intestate and his companions.

The motion to nonsuit was properly overruled.

(2) The defendant asked witness Cranford this question: "What did Jeff Parrish tell you with reference to riding on that skip?" Plaintiff objects; sustained; exception.

The declarations of Jeff Parrish to Cranford are hearsay and incompetent. They were not offered to contradict Parrish, for he had not been examined as a witness. He was afterwards introduced and examined as a witness for defendant, and no such question was asked him.

(3) The defendant excepts to the following part of his Honor's charge: "Now, if you find, from the evidence, that the defendant used the car for the purpose of carrying his employees from the mine to the surface,

and that the intestate boarded the car for that purpose, and the car was derailed while in transit, before it reached the surface, and the intestate thereby thrown down the shaft and killed, you may consider such derailment as a circumstance in connection with other evidence in finding whether the defendant was negligent in the respects complained of; that is, you may consider the fact of derailment, if you find from the evidence that the car was derailed, as a circumstance tending to show negligence.

"Plaintiff contends that there is other evidence which should be considered by the jury in connection with this, and that upon all the evidence the jury should find that there was negligence on the part of the defendant; that the car referred to was a self-dumping car; that the bail was connected with the car near the rear part; that there was no chain or other appliance used in connection with the car for the purpose of securing it upon the rails.

"The defendant contends that the car was such as was approved and in general use among the mines at that time for the purpose for which it was installed; that it was not intended for use by the employees in the mine, and that it was safe for the purpose for which it was constructed and operated.

"Now, you are to consider the evidence relating to these contentions of the parties, and, after finding the facts from the evidence, and applying the principle which has been stated, say whether the plaintiff's intestate was killed by the negligence of the defendant, and whether such negligence was the proximate cause of his death."

The ground of the objection is that there is no evidence to support it, and that his Honor applied the doctrine of *res ipsa loquitur.*

As we have said, there is abundant evidence of a permissive user of the skip, and that it could have been made reasonably safe.

His Honor very properly and correctly allowed the jury to consider the *res ipsa loquitur* as a circumstance in evidence tending with the other evidence to prove negligence. *Ridge v. R. R.,* 167 N. C., 518, and cases there cited.

No error.